# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**Misc. Dkt. No. 2020-02**

_____

**UNITED STATES**
*Appellant*

**v.**

**Matthew C. HARRINGTON**
Senior Airman (E-4), U.S. Air Force, *Appellee*

_____

Appeal by the United States Pursuant to Article 62, UCMJ

Decided 26 August 2020[1]

_____

*Military Judge:* Christopher M. Schumann (arraignment); Bryan D. Watson.

*GCM convened at:* Nellis Air Force Base, Nevada.

*For Appellant:* Major Dayle P. Percle, USAF (argued); Colonel Shaun S. Speranza, USAF; Mary Ellen Payne, Esquire.

*For Appellee:* Captain Alexander A. Navarro, USAF (argued); Mark C. Bruegger, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Chief Judge J. JOHNSON delivered the opinion of the court, in which Senior Judge POSCH and Judge KEY joined.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

---

[1] We heard oral argument in this case in a closed session on 24 July 2020.

J. JOHNSON, Chief Judge:

One Charge and Specification alleging Appellee committed sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920, were referred for trial by general court-martial on 13 May 2019.[2] Appellee was arraigned on 7 June 2019; the military judge presided over a motions hearing on 15 and 16 October 2019; and the court-martial resumed on 9 March 2020. On 10 March 2020, the military judge dismissed the Charge and Specification, with prejudice, finding a violation of Appellee's Sixth Amendment[3] right to speedy trial.

The Government brings this interlocutory appeal under Article 62, UCMJ, 10 U.S.C. § 862, challenging the military judge's ruling on the grounds that he erred in finding a violation of Appellee's Sixth Amendment right to a speedy trial. We agree.

## I. BACKGROUND

The court-martial that is the subject of this appeal represents the Government's second attempt to prosecute Appellee for this particular Charge and Specification. In November 2016, a general court-martial convicted Appellee for this offense, contrary to his pleas, but on 25 September 2018 this court set aside the findings and sentence and authorized a rehearing. *United States v. Harrington*, No. ACM 39223, 2018 CCA LEXIS 456 (A.F. Ct. Crim. App. 25 Sep. 2018) (unpub. op.) (*Harrington I*). A fuller account of the events that gave rise to the Charge and Specification and of the first court-martial are set forth in that opinion. For purposes of the present appeal, a more abbreviated account is sufficient.

### A. Factual Background[4]

In January 2016, Appellee and Staff Sergeant (SSgt) FC[5] were co-workers stationed at Creech Air Force Base (AFB), Nevada. On 30 January 2016, SSgt

---

[2] Unless otherwise noted, references to the punitive articles of the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2012 ed.); all other references to the UCMJ, the Rules for Courts-Martial, and the Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] U.S. CONST. amend. VI.

[4] The background is drawn from the record of the first court-martial and this court's opinion in *Harrington I*.

[5] SSgt FC was a senior airman (SrA) at the time of the alleged offense, but a SSgt at the time of the rehearing.

FC attended a party at the off-base residence of another co-worker, Technical Sergeant (TSgt) KW.[6] Appellee and several other individuals, mostly Airmen, also attended the party. SSgt FC and Appellee had no prior romantic or sexual relationship.

Appellee, SSgt FC, and several others played adult party games. One game was an "adult" or "drinking" version of Jenga, a game that involves removing individual blocks from a tower of blocks. In this version, each block had an instruction printed on it for the participant to perform, often of a titillating nature—for example, removing an article of clothing or electing to take a "body shot" of alcohol from a location on another player's body. In the course of the game, SSgt FC lowered or removed her pants, and Appellee elected to take "body shots" from SSgt FC's mouth, from her cleavage, and from between her buttocks. SSgt FC permitted Appellee to do so as part of the game. TSgt KW and another attendee, LB,[7] were among those present during the Jenga game.

Most of the partygoers consumed alcohol before and during the games, and SSgt FC became highly intoxicated. She had to leave the games at certain points because she felt sick. Eventually, TSgt KW and another individual put SSgt FC to bed in an upstairs bedroom to sleep as the party continued downstairs. SSgt FC testified at the first trial that when she awoke sometime later, her pants were lowered to around her thighs, and Appellee was lying behind her with his penis inside her and his hand on her hip. As SSgt FC initially lay immobile, Appellee "thrusted a few times" and kissed her on the shoulder. When SSgt FC moved slightly, Appellee withdrew and moved away from her on the bed. When Appellee stopped moving, SSgt FC arose, pulled her pants up, and left the room.

**B. First Court-Martial and *Harrington I***

Appellee was charged with a single specification of sexual assault by causing bodily harm to SSgt FC in violation of Article 120, UCMJ. Before the first trial, the Defense filed a motion to admit certain evidence regarding SSgt FC under Mil. R. Evid. 412, including *inter alia* SSgt FC's behavior during the Jenga game. The Defense contended this evidence was admissible as both evidence of prior sexual behavior with the Appellee under Mil. R. Evid. 412(b)(1)(B) and was constitutionally required evidence under Mil. R. Evid.

---

[6] TSgt KW was a SSgt at the time of the alleged offense, but a TSgt at the time of the rehearing.

[7] LB was a SrA at the time of the party, but separated from the Air Force between the time of the original trial and the rehearing.

412(b)(1)(C), in support of defenses based on both actual consent and reasonable mistake of fact as to consent. The Government and SSgt FC—through her Special Victims' Counsel (SVC)—opposed the motion.

The military judge who presided over the first court-martial conducted a closed Article 39a, UCMJ, 10 U.S.C. § 839(a), session where he received evidence and heard argument. Both LB and TSgt KW testified at this hearing. LB testified, *inter alia*, that SSgt FC lowered her pants during the Jenga game, and that Appellee took shots from SSgt FC's buttocks and between her breasts. TSgt KW testified, *inter alia*, that she remembered Appellee took a shot from SSgt FC's mouth during the Jenga game. The military judge ruled the evidence of SSgt FC's behavior with Appellee during the Jenga game was not admissible under Mil. R. Evid. 412(b)(1)(B) or (C). He allowed evidence that SSgt FC, Appellee, and other attendees played party games that involved drinking alcohol, but he did not permit references to anyone's specific behavior during the games.

The Defense repeatedly requested reconsideration of this ruling throughout the trial, but the military judge denied each request. On 20 November 2016, the court members convicted Appellee as charged. The sentence approved by the convening authority included a dishonorable discharge, forfeiture of $1,066.00 pay per month until completion of appellate review, reduction to E-1, and a reprimand.

On 25 September 2018, a divided panel of this court found the military judge erred by excluding the Mil. R. Evid. 412 evidence of the interactions between Appellee and SSgt FC during the Jenga game. *Harrington I*, unpub. op. at *12–22. The court set aside the findings and sentence, returned the record of trial, and authorized a rehearing. *Id.* at *22.

**C. Toward a Rehearing**

On 25 October 2018, the Government moved this court for reconsideration. On 26 October 2018, the Military Justice Division at Joint Base Andrews, Maryland, returned the record of trial to the legal office at Nellis AFB—prematurely, in light of the pending motion at the Court of Criminal Appeals. After the record arrived at Nellis AFB, the legal office sent it back to the Military Justice Division pending resolution of the motion for reconsideration and a possible appeal to the United States Court of Appeals for the Armed Forces (CAAF).

On 19 November 2018, this court denied the motion for reconsideration. The Judge Advocate General elected not to refer *Harrington I* to CAAF, and the record was ultimately returned to the Nellis AFB legal office on 4 February 2019. At some point between 19 and 22 February 2019, the Government determined SSgt FC was willing to participate in a rehearing and did not support

an alternative disposition of the case. Over the next several weeks, various individuals and offices at Nellis AFB and elsewhere coordinated in order to return Appellee to duty for a rehearing. As of 23 April 2019, Appellee had reported to Creech AFB and was represented by an Area Defense Counsel (ADC). On 13 May 2019, the convening authority referred the Charge and Specification to a general court-martial for a rehearing. The trial was originally set for 19 August 2019.

On 30 May 2019, Appellee's ADC submitted on behalf of Appellee a request for individual military defense counsel (IMDC) in order to be represented by Appellee's trial defense counsel from the first court-martial, who had changed positions and was serving as a senior trial counsel.

Appellee was arraigned on 7 June 2019, while the IMDC request was pending. Appellee deferred forum selection, motions, and pleas at that time.

On 12 June 2019, the Defense made a written demand for speedy trial in conjunction with a discovery request. The IMDC request was denied on 24 July 2019. On 31 July 2019, a circuit defense counsel (CDC) was detailed to join the ADC in representing Appellee, and on 5 August 2019 the Defense moved for a continuance in order to give the CDC time to prepare. The military judge granted the continuance and set 15 October 2019 as the new trial date.

On 27 September 2019, as the new trial date approached, the Government moved to have LB declared unavailable for purposes of testifying at the rehearing. In support of its motion, the Government attached an email that a paralegal sent LB in June 2019 requesting that LB call the paralegal regarding the rehearing. The Defense opposed the motion, and the military judge denied it, finding the Government had provided insufficient evidence of LB's unavailability.

On 11 October 2019, the Government informed the Defense it could not find LB and would be unable to arrange for him to travel to the rehearing. The Defense then moved for a continuance and to compel the Government to produce LB. On 13 October 2019, the military judge granted the defense request for a continuance and set a new trial date of 9 March 2020. The military judge held a motions hearing on 15 October 2019, the previously scheduled trial date.

## D. Speedy Trial Motion and Rulings

The motions hearing continued into 16 October 2019, when the Defense moved to dismiss the Charge and Specification for violation of Appellee's right to speedy trial under both R.C.M. 707 and the Sixth Amendment. The military

judge denied the motion to dismiss in a written ruling dated 28 October 2019.[8] With respect to the Sixth Amendment, the military judge applied the four factors from *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972). First, he found the length of the delay was facially unreasonable under the circumstances and warranted a full *Barker* analysis; in particular, he found very little progress was made in bringing Appellee to trial between 4 February 2019 and the arraignment on 7 June 2019. The military judge noted that because this was a rehearing, the investigation was already complete, no Article 32, UCMJ, 10 U.S.C. § 832, hearing was required, and the Charge and Specification were the same as previously litigated. Second, he found the reasons for the delay were "nearly all . . . primarily attributable to the Government's processing of this case, or . . . derived immediately therefrom." He particularly noted the record disclosed little explanation for the delay between 4 February 2019 and referral on 13 May 2019, and again noted that because this was a rehearing, the investigation was already complete and no Article 32, UCMJ, hearing was required. Third, the military judge found the June 2019 demand for speedy trial tipped that factor in the Defense's favor, but "only very slightly." Finally, and at this point decisively, the military judge found no demonstrated prejudice to Appellee at that time. In particular, he found that because the Defense's requested witnesses had not been produced or provided testimony, he could not assess whether the Defense's case at trial had been impaired. Accordingly, he denied the motion to dismiss at that point, but enjoined the parties to be "vigilant for evidence of prejudice to the Accused as this case progresses toward trial."

The court-martial reconvened on 9 March 2020. The Defense orally moved for reconsideration of its motion to dismiss for violation of Appellee's right to a speedy trial, specifically under the Sixth Amendment. The military judge conducted a hearing at which LB and TSgt KW testified. LB testified, *inter alia*, that even after reviewing his prior motion testimony from the original trial, he could no longer remember some details of the night of the party, and of the Jenga game in particular. Although he now remembered Appellee taking a body shot from SSgt FC's belly (and vice versa), he could not remember Appellee taking shots from SSgt FC's breasts or buttocks. LB also acknowledged he had "dodged" the Government's efforts to contact him prior to October 2019. TSgt KW testified that in June 2017 she began to experience symptoms of epilepsy, and in June 2019 she was formally diagnosed with that disorder. She testified this condition had dramatically impaired her short-term and long-

---

[8] With respect to the requirement in Rule for Court-Martial (R.C.M.) 707 that the Government bring Appellee to trial within 120 days, the military judge found the 120 days began running on 4 February 2019; with excludable time excluded, he found the Government arraigned Appellee within the 120-day requirement.

term memory. As of March 2020, TSgt KW barely recalled the night of the party and remembered nothing of the Jenga game.

On 10 March 2020, the military judge granted the defense motion to dismiss with prejudice. He again assessed the *Barker* factors, reaching similar findings and conclusions with respect to the length of the delay, reasons for the delay, and demand for speedy trial as he had in his 28 October 2019 ruling. He added that the reason the trial had been continued until 9 March 2020 was that until that point the Government's efforts to secure the presence of LB had been "wholly inadequate." As to the fourth *Barker* factor, prejudice, the military judge now found Appellee's ability to defend himself at trial had been impaired due to the lost memories of LB and TSgt KW. He included in his findings of fact the conclusion "that if the United States had proceeded expeditiously with bringing this case to a rehearing, it is likely that at least some of the exculpatory evidence which [the Court of Criminal Appeals] directed to be admitted at this hearing[9] (and which the Defense seeks to introduce) would have been available."

The military judge rejected the Government's arguments that admitting LB's and TSgt KW's prior testimony from the first trial under either Mil. R. Evid. 803(5) or Mil. R. Evid. 804(b)(1) would be an adequate substitute. With regard to Mil. R. Evid. 804(b)(1), the military judge found the prior trial defense team did not have a sufficiently similar motive for presenting testimony at a Mil. R. Evid. 412 motion hearing as the current defense team would have in using the testimony for findings, given the respective burdens and purposes involved. With regard to Mil. R. Evid. 803(5), the military judge acknowledged that although the Defense would be permitted to avail itself of that rule, he would not require the Defense to "rely nearly-exclusively upon this rule as the sole source of the very information which the [Court of Criminal Appeals] has directed should now be admissible, while simultaneously leaving the Government free to attempt to prove its own case with live witnesses."

### E. Reconsideration

The Government promptly moved for reconsideration, which the military judge agreed to entertain. The Government offered additional evidence in support of its motion. First, it attached numerous emails from the period between

---

[9] This characterization of *Harrington I* is inaccurate. The court's opinion did not "direct" that any evidence be admitted at a rehearing; it directed only that the findings and sentence of the first court-martial were set aside due to an error, and that the record be returned, and a rehearing authorized. *Harrington I*, unpub. op. at *22.

4 February 2019 and 28 May 2019 indicating the administrative steps the Government was taking to bring Appellee to a rehearing. Second, it called SSgt SC, another individual who attended the January 2016 party, to provide motion testimony.[10] SSgt SC testified that he recalled Appellee taking body shots from SSgt FC's mouth, belly, and rear. He could not recall whether someone took a shot from SSgt FC's chest. After SSgt SC testified, the military judge noted for the record his observations of SSgt SC's demeanor when he testified. The military judge observed that SSgt SC appeared "thoughtful" and "careful with his words," but "hesitant" and "halting" when he was "trying to recollect." During argument on the reconsideration motion, the Government offered to stipulate to the relevant facts; however, when the military judge asked the Defense whether it would agree to such a stipulation, the Defense declined to do so.

After receiving argument, the military judge denied the Government's reconsideration motion orally and in writing. The military judge adopted the findings of fact from his 10 March 2020 ruling dismissing the Charge and Specification with prejudice, but accepted the Government's recitation of the administrative steps the Government took to retry Appellee. The military judge found SSgt SC's testimony to be an insufficient substitute for the lost memories of LB and TSgt KW. He found SSgt SC's memory was "flawed, . . . due, in some part, to the passage of time," and that SSgt SC's "reliability as a witness [was] low." In addition, SSgt SC could not remember Appellee taking a shot from SSgt FC's breasts, as LB had previously testified to. The military judge further commented that under the circumstances he would "not force" Appellee to agree to a stipulation of fact. With regard to the Government's evidence of administrative steps, the military judge stated:

> [T]he United States has provided insufficient information that would, in any way, excuse the amount of time that the United States took in order to bring [Appellee] properly before this rehearing. The obvious delay in getting the case referred to trial, about 100 days, from receipt of the requisite materials until the actual referral, plus the amount of time that passed as a result of the continuance necessitated by the inadequacy of the Government's action to locate [LB], totals approximately 246 days.
>
> . . . .
>
> Regarding . . . the period from late January through May of 2019, the Court notes that the Government's filing contains numerous

---

[10] SSgt SC did not testify at Appellee's first court-martial.

references to a list of administrative tasks which had to be accomplished by military personnel . . . .

However, . . . [a]ccording to that list of activities, apparently little or no effort was made during this timeframe in order to actually interview, prepare, or even locate actual live witnesses for this rehearing.

[ ] The Court is well aware of the various administrative tasks required in order to bring an Accused onto active duty for a rehearing. . . . However, that is not the point of this Motion to Dismiss. Had the Government begun preparing this case for actual litigation, the Government's representatives would have had the opportunity to detect the memories which were degrading, along with [TSgt KW's] worsening medical condition. . . . Because the Government was, apparently, not actually preparing for courtroom litigation during this timeframe, these issues went undetected for months. . . .

The military judge reiterated that preparing Appellee's rehearing should have been simplified by the fact that the Charge, Specification, and witnesses were the same as for the prior trial, and the Government provided "no evidence" that any of the witnesses were actually difficult to locate—to include LB after the military judge's "intervention in October 2019." The military judge continued:

Upon reconsidering this matter, this Court must continue to arrive at the conclusion that the United States, even if it has not been derelict or negligent, has nonetheless fallen short in its obligations in bringing this case to a rehearing, and the Defense has been directly and substantially prejudiced as a result. All of this has had the ultimate result of thwarting the express intent of [the Court of Criminal Appeals] when it authorized a rehearing in this case.

. . . .

[ ] If the United States had proceeded expeditiously and effectively with bringing this case to a rehearing, it is likely that at least some of the exculpatory evidence which [the Court of Criminal Appeals] specifically directed to be admitted at this rehearing, and which the Defense seeks to introduce, would have been available for [Appellee's] use.

On 13 March 2020, the Government provided timely notice of its intent to appeal. The record was delivered to the court on 31 March 2020.

## II. DISCUSSION

### A. Law

#### 1. Jurisdiction and Standard of Review

This court has jurisdiction to hear this appeal under Article 62(a)(1)(A), UCMJ, 10 U.S.C. § 862(a)(1)(A), which authorizes the Government to appeal "[a]n order or ruling of the military judge which terminates the proceedings with respect to a charge or specification."

When the Government appeals a ruling under Article 62, UCMJ, this court reviews the military judge's decision "directly and reviews the evidence in the light most favorable to the party which prevailed at trial." *United States v. Lewis*, 78 M.J. 447, 453 (C.A.A.F. 2019) (quoting *United States v. Pugh*, 77 M.J. 1, 3 (C.A.A.F. 2017)). Because this issue is before us pursuant to a Government appeal, we may act only with respect to matters of law. Article 62(b), UCMJ, 10 U.S.C. § 862(b). We may not make findings of fact, as we are limited to determining whether the military judge's factual findings are clearly erroneous or unsupported by the record. *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004).

We review Sixth Amendment speedy trial issues de novo. *United States v. Danylo*, 73 M.J. 183, 189 (C.A.A.F. 2014) (citing *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). "In analyzing an appellant's speedy trial right, we 'giv[e] substantial deference to the military judge's findings of fact unless they are clearly erroneous.'" *Id.* (alteration in original) (quoting *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010)).

#### 2. Speedy Trial

An accused's right to speedy trial is protected by statute, by regulation, and by the Constitution. *United States v. Tippit*, 65 M.J. 69, 72 (C.A.A.F. 2007); *see also United States v. Reed*, 41 M.J. 449, 451 (C.A.A.F. 1995)). For military servicemembers, the Sixth Amendment right to speedy trial is triggered by the preferral of charges or the imposition of pretrial restraint. *Reed*, 41 M.J. at 451. "In determining whether an appellant has been denied his right to a speedy trial under the Sixth Amendment, this Court considers the following factors: '(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant.'" *Danylo*, 73 M.J. at 186 (quoting *United States v. Mizgala*, 61 M.J. 122, 129 (C.A.A.F. 2005) (citing *Barker*, 407 U.S. at 530)). However, "none of the four factors . . . [i]s either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533. With regard to prejudice, the Court in *Barker* explained:

> Prejudice, of course, should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. This Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past.

*Id.* at 532. An accused who asserts a violation of the Sixth Amendment right to speedy trial bears the burden of persuasion to demonstrate the existence of prejudice. *See* R.C.M. 905(c)(2)(A); *Danylo*, 73 M.J. at 189.

In contrast to the Sixth Amendment, the Fifth Amendment[11] speedy trial guarantee applies even before an accused is formally charged or subjected to pretrial restraint. *See Reed*, 41 M.J. at 451 (analyzing alleged violation of speedy trial under Fifth Amendment because "Sixth Amendment speedy-trial protection does not apply to pre-accusation delays where there has been no restraint") (citations omitted). However, "[a]bsent restraint, the 'primary guarantee' . . . against pre-accusation delay is the statute of limitations." *Id.* (quoting *United States v. Marion*, 404 U.S. 307, 322 (1971)). In order to demonstrate a speedy trial violation under the Fifth Amendment, "the defendant has the burden of proof to show an egregious or intentional tactical delay and actual prejudice." *Id.* at 452. For example, "[t]here may be a due process violation when [delay is] 'incurred in wreckless [sic] disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.'" *Id.* (quoting *United States v. Lovasco*, 431 U.S. 783, 795 n.17 (1977)).

### 3. Exceptions to the Hearsay Rule

Hearsay, defined as an out-of-court statement offered for the truth of the matter asserted in the statement, is generally inadmissible unless an exception applies. Mil. R. Evid. 801(c); Mil. R. Evid. 802. One such exception is Mil. R. Evid. 803(5), which provides that a record "on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately," "was made or adopted by the witness when the matter was fresh in the witness's memory," and "accurately reflects the witness's knowledge," is not excluded by the rule against hearsay and may be read into evidence.

---

[11] U.S. CONST. amend. V.

Mil. R. Evid. 804(b)(1) provides another exception to the rule against hearsay for, *inter alia*, former testimony that:

> (A) was given by a witness at a trial, hearing, or lawful deposition, . . . and (B) is now offered against a party who had an opportunity and similar motive to develop it by direct, cross-, or redirect examination. . . . [A] record of testimony given before a court-martial, court of inquiry, military commission, other military tribunal, or preliminary hearing under Article 32 is admissible . . . if the record of the testimony is a verbatim record.

## B. Analysis

Although Appellee has not been confined, the Charge and Specification have never been dismissed and have remained pending since *Harrington I* was decided. Accordingly, Appellee's Sixth Amendment right to speedy trial has remained in effect throughout the time period relevant to the instant appeal.[12] *See Reed*, 41 M.J. at 451. Therefore, we turn to the military judge's assessment of the *Barker* factors.

### 1. Length of Delay

The military judge focused on two particular periods to find facially unreasonable delay: the "about 100 days" that elapsed between 4 February 2019, when the record was returned to Nellis AFB, and 13 May 2019, when the convening authority referred the Charge and Specification to trial;[13] and the 146 days that elapsed between the 15 October 2019 scheduled trial date and the rescheduled date of 9 March 2020 resulting from the granted defense motion for a continuance.[14]

With respect to the delay between 4 February 2019 and 13 May 2019, we agree with the military judge in certain respects. First, based on the record before us, it appears the Government approached the steps required to retry Appellee in a sequential manner, focusing first on contacting SSgt FC, then on the process to return Appellee to duty for trial, then on routing the referral to

---

[12] Because Appellee fails in his burden to demonstrate prejudice to prevail under a Sixth Amendment analysis, we find it unnecessary to analyze the higher threshold to demonstrate a Fifth Amendment violation. *See Reed*, 41 M.J. at 452.

[13] The exact period is 98 days.

[14] To a lesser extent, the military judge also suggested the Government contributed to the first defense request for a continuance from 19 August 2019 until 15 October 2019 in order to give the newly appointed senior defense counsel time to prepare, because Appellee's 30 May 2019 IMDC request was not denied until 24 July 2019. However, the military judge does not appear to have factored this period in the "approximately 246 days" of delay he specified in his ruling on the motion for reconsideration.

the convening authority. According to the Government's own chronology, periods of up to a week or more passed without discernible progress toward the rehearing; there is little doubt the case could have been processed faster than it was. In addition, we agree with the military judge that, other than contacting SSgt FC through SVC channels to determine if she was willing to participate in a rehearing, it appears that prior to June 2019 the Government did little to prepare for actual litigation—for example, locating or contacting other witnesses. Furthermore, we agree with the military judge that in some respects the rehearing on the same Charge and Specification should have been simpler to prepare than the original trial, because it had been done before and no Article 32, UCMJ, hearing was required.

Moreover, we disagree with the Government's reliance on R.C.M. 707's 120-day deadline for bringing an accused to arraignment as establishing the standard for a presumptively unreasonable delay in a Sixth Amendment context. As the Court explained in *Barker*, the Sixth Amendment right to speedy trial is not amenable to bright-line rules, and "is necessarily dependent upon the peculiar circumstances of the case." 407 U.S. at 530–31. The Government would have us apply the R.C.M. 707 standard out of its intended context—as an additional rule-based requirement for the Government to meet—and use it to limit an accused's ability to invoke the constitutional protections of the Sixth Amendment. We are not persuaded R.C.M. 707 is intended to shield the Government from scrutiny for what is an otherwise facially unreasonable delay.

However, we are also mindful that "[w]hile justice should be administered with dispatch, the essential ingredient is orderly expedition and not mere speed." *Smith v. United States*, 360 U.S. 1, 10 (1959). There was a certain logic to how the Government proceeded through the steps of bringing Appellee to a rehearing. Ascertaining SSgt FC's willingness to participate was a legitimate starting point, and returning an accused from civilian life to active duty for trial may be a relatively unusual situation for a legal office to navigate. Although the Government was certainly not swift, even the military judge implied he did not find it had been "derelict or negligent" in its responsibilities.

Turning to the continuance from 15 October 2019 to 9 March 2020, the 146-day delay is certainly significant. However, whether it is "unreasonable" requires some consideration of what the delay was for. On the surface, the delay was requested by the Defense in order to secure the presence of LB, a witness the Defense desired. In addition, the specific date of 9 March 2020 appears to have been driven at least in part by trial defense counsel's availability.

Nevertheless, the military judge placed responsibility squarely on the Government's "wholly inadequate" efforts to secure the presence of LB. It is true the Government provided scant evidence of its pre-October 2019 efforts in that

regard. Moreover, in its response to the Defense's motion to dismiss, the Government "freely acknowledge[d] that the second Defense continuance was largely the result of the Government's inability to secure a necessary witness."

Yet there is also little evidence that the Defense specifically requested LB's presence prior to its motion to compel on 11 October 2019. The Defense had evidently relied on the fact that LB was on the Government's list of anticipated witnesses; however, the Government was under no obligation to call LB at trial or to keep him on its witness list. Although the military judge repeatedly asserted in his rulings that this court's opinion in *Harrington I* had "directed" that LB's testimony be admitted at the rehearing, this court's opinion did not require the admission of any evidence or the production of any witnesses. Rather, this court directed only that the findings and sentence of the first court-martial be set aside due to an error, that the record be returned, and a rehearing was authorized. *Harrington I*, unpub. op. at \*22. Whether there would be a rehearing, and what evidence would be admitted at it, of course depended on subsequent decisions by the relevant authorities and upon the parties themselves.

In summary, we are less certain than the military judge of the existence of a facially unreasonable delay. Nevertheless, for purposes of our analysis we will assume the military judge did not err in this respect, that there was sufficient facially unreasonable delay to warrant an analysis of all the *Barker* factors, and that this factor weighs in Appellee's favor.

**2. Reasons for Delay**

Any facially unreasonable delay between 4 February 2019 and 13 May 2019 must be attributed to the Government, as the processing of the case was entirely in the Government's hands. There is no indication that Appellee resisted or obstructed the process of being returned to duty for trial. Similarly, as discussed above, although we find the Government's actions less patently offensive to the Sixth Amendment than the military judge evidently did, we assume for purposes of our analysis that the Government also bore primary responsibility for the delay from 15 October 2019 until 9 March 2020. Accordingly, we weigh this factor moderately in Appellee's favor.

**3. Demand for Speedy Trial**

The third factor is "[w]hether the appellant made a demand for a speedy trial." *Mizgala*, 61 M.J. at 129 (citing *Barker*, 407 U.S. at 530) (additional citation omitted). As the Government conceded in its response to the defense motion to dismiss, Appellee included a demand for speedy trial with a discovery request on 12 June 2019. Accordingly, we agree with the military judge's assessment that Appellee "met the minimum threshold," and this factor weighs in his favor, albeit "only very slightly."

### 4. Prejudice

It is with respect to the final *Barker* factor that we find the military judge erred. As an initial matter, we note that the burden to demonstrate the existence of prejudice rested with the Defense at trial. *See* R.C.M. 905(c)(2)(A); *Danylo*, 73 M.J. at 189. In addition, Appellee was not confined at any point, and we agree with the military judge that Appellee has not demonstrated specific anxiety or concern distinguishable from that experienced by other accuseds awaiting trial. *See Danylo*, 73 M.J. at 188–89. However, the military judge's conclusion that Appellee's ability to defend himself at the rehearing was impaired as a result of the delay was erroneous in two significant respects.

### a. Finding of "Fact" that Delay "Likely" Caused Loss of Evidence

The first error is the military judge's purported finding of fact that "if the United States had proceeded expeditiously with bringing this case to a rehearing, it is likely that at least some of the exculpatory evidence which the [Court of Criminal Appeals] directed to be admitted at this hearing . . . would have been available for [Appellee's] use at this rehearing." We question whether the finding that something is "likely"—that is, a possibility—is a finding of "fact"— that is, something that actually exists—by the military judge for purposes of our review. *See United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) ("Military judges must be careful to restrict findings of fact to things, events, deeds or circumstances that 'actually exist' as distinguished from 'legal effect, consequences, or interpretation.'"). The evidence before the military judge simply did not establish at what point between the first trial in November 2016 and the motion hearing on 9 March 2020 either LB or TSgt KW lost their memories of the events during the Jenga game to which they previously testified. To be clear, the point is not that the military judge could not reach any conclusion regarding the existence of prejudice based on the limited evidence before him; our point is simply that we doubt that a finding that something was possible, even "likely," is a determination of "fact" which we are bound to review under a clear error standard.

Moreover, even assuming that a finding that something is "likely" is a finding of fact, we conclude the military judge's finding that "it is likely that at least some" of the lost evidence might have been preserved had the Government proceeded "expeditiously" is not supported by the record. With regard to TSgt KW, the record indicates that in November 2016 she remembered the January 2016 party and the Jenga game generally, and specifically remembered Appellee took a shot from SSgt FC's mouth. In June 2017, TSgt KW began experiencing symptoms of epilepsy. In June 2019, she was formally diagnosed with the disorder, a side effect of which can be a dramatic impairment of long-term memory. On 9 March 2020, TSgt KW remembered "almost noth-

ing" about the party, and could not remember the Jenga game at all. For purposes of analysis, even if we subtract the full 246 days the military judge refers to in his ruling on reconsideration—which effectively assumes the convening authority referred the case on the same day the record was returned to Nellis AFB—the rehearing would have convened around 7 July 2019, after TSgt KW's epilepsy had set in and, in any event, more than two and a half years after her previous testimony. We conclude any finding of fact that at some point between 7 July 2019 and 9 March 2020, and not earlier, it is "likely" TSgt KW lost the specific memory of Appellee taking a shot from SSgt FC's mouth is speculative and unsupported by the record.

Although the passage of time has had a less dramatic impact on LB's memory in general, our analysis is similar. In November 2016, LB testified that during the Jenga game SSgt FC lowered her pants, and that Appellee took shots from SSgt FC's buttocks and between her breasts. On 9 March 2020, LB still had some memory of the Jenga game, and remembered Appellee took a shot from SSgt FC's belly and vice versa, but he did not recall SSgt FC lowering her pants or the shots from her buttocks and breasts. The record provides no basis to conclude it is "likely" these memories were lost during the eight months between July 2019 and March 2020. Rather, it is equally if not more likely these memories were lost during the more than 31 months that elapsed between the first trial in November 2016 and July 2019—and again, this essentially assumes the case could have been referred as soon as it returned to Nellis AFB, which is not necessarily what "orderly expedition" required under the circumstances. *See Smith*, 360 U.S. at 10.

The record does not support a finding of "fact" that memories were "likely" lost as a result of the Government's facially unreasonable delay. Moreover, our review of the evidence indicates the Defense did not carry its burden to demonstrate that the memories were lost as a result of the facially unreasonable delay. *See Danylo*, 73 M.J. at 189 (citing *Doggett v. United States*, 505 U.S. 647, 654 (1992)).

### b. Prejudice from LB's and TSgt KW's Lost Memories

Equally significant, we find the military judge erred in his conclusion that Appellee was actually prejudiced by the lost memories of LB and TSgt KW.

At trial and on appeal, the Government contends that the record of the prior testimony of TSgt KW and LB regarding the now-forgotten shots from SSgt FC's mouth, buttocks, and breasts, and the lowering of her pants, will be admissible under Mil. R. Evid. 803(5) and Mil. R. Evid. 804(b)(1). Therefore, the substance of the specific evidence that this court found in *Harrington I* had been erroneously excluded from Appellee's first trial will be available to the

Defense at the rehearing. The military judge did not deny that the prior testimony would be admissible under Mil. R. Evid. 803(5).[15] However, he "refuse[d] to require the Defense to use . . . [Mil. R. Evid.] 803(5) in order to mount their defense of [Appellee]." He explained his reasoning as follows:

> While the witness' [sic] former testimony may meet the definition of recorded testimony in order to <u>permit</u> its admissibility, this Court will not <u>require</u> that the Defense rely nearly-exclusively upon this rule as the sole source of the very information which the [Court of Criminal Appeals] has directed should now be admissible, while simultaneously leaving the Government free to attempt to prove its own case with live witnesses.

> . . . [T]his Court specifically notes that this Accused attempted to introduce substantial amounts of [Mil. R. Evid.] 412 evidence at his 2016 trial in an effort to show his own innocence. The Government opposed that effort, and was successful in having the potentially exculpatory evidence kept from the members. This Court will require the Government to live with its own success.

> [ ] This is because the Government's success was error, as the Air Force Court of Criminal Appeals has clearly instructed us through its unpublished opinion that authorized the instant rehearing.

> [ ] Now, the Government persists in attempting to further benefit from its own erroneous success, to the specific detriment of [Appellee] and despite [Appellee's] best efforts to the contrary at his first trial. If the Government were to prevail on the motion now before this Court, the outcome would be that [Appellee] would be forever foreclosed from presenting the exact evidence which (a) he was capable of presenting at his first trial, (b) he was prevented by the Government from presenting, and (c) the

---

[15] The parties and military judge have devoted considerable attention to whether the prior testimony would also be admissible under Mil. R. Evid. 804(b)(1). In particular, the Government challenges the military judge's conclusion that the original trial defense team had an insufficiently similar motive to develop TSgt KW's and LB's testimony during the Mil. R. Evid. 412 motion hearing, as compared to the current defense team's intended use of the testimony on the merits at the rehearing. *See* Mil. R. Evid. 804(b)(1); *United States v. Hutchins*, No. 200800393, 2018 CCA LEXIS 31, at *51 (N.M. Ct. Crim. App. 29 Jan. 2018) (unpub. op.) (quoting *United States v. DiNapoli*, 8 F.3d 909, 914–15 (2d Cir. 1993)). However, the military judge apparently concluded the evidence would be admissible under Mil. R. Evid. 803(5), and we agree, which moots the question of admissibility under Mil. R. Evid. 804(b)(1). Accordingly, we need not resolve this question.

> Air Force Court of Criminal Appeals has found to be so important that it set aside his resulting conviction.
>
> [A]llowing this case to proceed against [Appellee], in the absence of any wrongdoing on the part of the Defense, would compound the Government's error even further. Moreover, it would specifically violate [Appellee's] Sixth Amendment rights and would permanently skew the fairness of this entire proceeding.

We find the military judge's reasoning problematic in several respects. First, it appears the military judge implicitly considered live testimony would be superior to recorded prior testimony, but he did not explain why this is so, and we are not convinced this is necessarily the case. The record of the prior motion testimony, which is the very evidence that prompted this court to set aside the original conviction, remains available to the Defense. Neither Appellee nor the military judge has identified any piece of relevant evidence of which *the substance* has been lost to the Defense as a result of the delay.

Second, as discussed above, this court's opinion in *Harrington I* did not mandate that any particular evidence must be admitted at a rehearing, or that Appellee was necessarily entitled to live testimony. *Harrington I* merely determined that Appellee had been prejudiced by the erroneous exclusion of evidence in the context of that particular trial.

Third, the military judge appears to lay at least some degree of responsibility for the erroneous exclusion of evidence at the first trial on the Government. This is unwarranted. Regardless of whether the Government opposed the introduction of the evidence, SSgt FC opposed it through her SVC, and the military judge was obliged to conduct a hearing and make an independent determination of admissibility. *See* Mil. R. Evid. 412(c)(2). The prior error was made by the previous military judge, not by the Government. We see nothing inappropriate in the Government having litigated the Mil. R. Evid. 412(c)(2) motion in good faith, such that equity somehow now favors Appellee as a result. Nor do we perceive that the Government is "persist[ing]" in pursuing any improper benefit, where it fully agrees with the admissibility of the prior testimony, and has expressed its willingness to stipulate to the prior testimony as fact.[16]

Fourth, in assessing the prejudice to Appellee's defense, it is appropriate to consider that the prior testimony of TSgt KW and LB does not stand alone. The prior testimony is part of a larger body of evidence available to the Defense to

---

[16] Of course, this is not to suggest the Defense was under any obligation whatsoever to agree to such a stipulation. The point is simply that the Government's offer is some evidence that it was not seeking to capitalize on the previous error.

portray what happened between SSgt FC and Appellee during the Jenga game. In addition to the prior testimony regarding shots from the mouth, buttocks, and breasts, and SSgt FC lowering her pants, as of 9 March 2020, LB was able to testify Appellee took a shot from SSgt FC's belly, and SSgt FC from Appellee's. In addition, as of 9 March 2020, SSgt SC could testify that he saw Appellee take a shot from SSgt FC's mouth, buttocks, and "stomach." It is true that the military judge found SSgt SC's reliability as a witness to be "low," based on his in-court observations; but SSgt SC's testimony need not stand alone. In combination, the prior testimony of TSgt KW and LB, LB's testimony at the rehearing, and SSgt SC's testimony at the rehearing offer a fairly clear portrayal of the nature of the interactions between SSgt FC and Appellee during the Jenga game, a portrayal that goes beyond the evidence this court found relevant and admissible in *Harrington I.*

For the reasons stated above, we find the military judge erred in concluding that the Defense demonstrated prejudice.

### 5. Summary of *Barker* Factors

In summary, for purposes of our analysis we assume the existence of a facially unreasonable delay and we weigh the length of delay in Appellee's favor; we weigh the reasons for delay moderately in Appellee's favor; and we weigh the demand for speedy trial very slightly in Appellee's favor. However, for the reasons stated above, we do not find prejudice resulting from the delay because (1) Appellee has failed to demonstrate TSgt KW and LB lost their memories during the period of facially unreasonable delay, and (2) Appellee has failed to demonstrate the lost memories of TSgt KW and LB have actually prejudiced his defense at trial, in light of the availability of their prior testimony and other testimony that remains available. Moreover, weighing the factors together, we consider the absence of prejudice to outweigh the remaining factors that, taken together, only moderately favor Appellee. Accordingly, we find the military judge erred in granting the defense motion to dismiss.

### III. CONCLUSION

The appeal of the United States under Article 62, UCMJ, 10 U.S.C. § 862, is **GRANTED**. The military judge's ruling to grant the defense motion to dismiss for violation of Appellee's right to speedy trial is **REVERSED**.

The record is returned to The Judge Advocate General for remand to the military judge for action consistent with this opinion.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court